UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

MARCHELL WRIGHT                                                              PLAINTIFF
on behalf of K.M.W.

v.                                                    CIVIL ACTION NO. 3:11-CV-526-S

MICHAEL J. ASTRUE,
Commissioner of Social Security                                              DEFENDANT

**FINDINGS OF FACT**
**CONCLUSIONS OF LAW**
**AND RECOMMENDATION**

**FINDINGS OF FACT**

Plaintiff Marchell Wright, the grandmother of minor claimant K.M.W., and her representative, has filed a complaint pursuant to 42 U.S.C.§1383(c)(3) to obtain review of a decision of the Commissioner of Social Security that denied her granddaughter's application for a child's supplemental security income (SSI). The claimant's mother, Teirra Wright, applied for a child's SSI on Nov. 27, 2007, alleging that her infant daughter was disabled at birth on Sept. 13, 2007, due to herpes encephalitis, seizures, asthma, coagulation problems and thermacemia trait (Tr. 152, 25-35). The Commissioner denied the application on initial consideration (Tr. 115, 117-23, 264-69) and again on reconsideration (Tr. 116, 125-31, 335-40). Wright then requested a hearing before and administrative law judge (ALJ) (Tr. 109-113, 132).

ALJ Michael Nichols conducted a hearing in Louisville, Kentucky, on March 10, 2010 (Tr. 41-55). Marchell Wright appeared with her two and one half year old granddaughter K.M.W., and their attorney, Greg Marks (Tr. 41). Medical expert Dr. James Belt testified telephonically (Tr. 47-53). Marchell Wright also testified (Tr. 54-55). Following the hearing, ALJ Nichols arranged for further evaluation of the minor claimant by Joseph L. Bargione, Ph.D.

(Tr. 578-583).

On Aug. 16, 2010, ALJ Nichols entered a hearing decision that denied K.M.W.'s application for SSI benefits (Tr. 23-36). In his decision, Nichols made the following findings:

(1) The claimant was born on Sept. 13, 2007. Therefore, she was a newborn/young infant on Nov. 13, 2007, the date the application was filed, and is currently a toddler approaching the age of 3 (20 C.F.R. 416.925a(g)(2)).

(2) The claimant has not engaged in substantial gainful activity since Nov. 13, 2007, the application date (20 C.F.R. 416.924(b) and 416.971, *et seq.*).

(3) The claimant has the following severe impairments: history of neonatal herpes simplex encephalitis now resolved, history of seizures associated with febrile state now resolved, history of mild developmental delay, and history of asthma adequately controlled (20 C.F.R. 416.924(c)).

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.924, 416.925 and 416.926).

(5) The claimant does not have an impairment or combination of impairments that functionally equals the listing (20 C.F.R. 416.924(d) and 416.926(a)).

(6) The claimant has not been disabled, as defined by the Social Security Act, since Nov. 13, 2007, the date the application was filed (20 C.F.R. 416.924(a)).

(Tr. 26, 36). Wright requested review of this adverse hearing decision by the Appeals Council (Tr. 17-18). The Appeals Council determined that no basis existed under the regulations to grant her request. (Tr. 1-6). Accordingly, Wright brought the present action in federal court to obtain judicial review of the Commissioner's decision. (DN 1).

a.   **Standard of Review.**

Review of a decision of the Commissioner is governed by 42 U.S.C. § 405(g). The statute, and case law that interprets it, requires a reviewing court to affirm the findings of the

Commissioner if they are supported by substantial evidence and the Commissioner has employed the appropriate legal standard. *Walters v. Commissioner of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997) ("This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.). Substantial evidence is defined by the Supreme Court to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971). *See also, Lashley v. Sec'y of HHS*, 708 F.2d 1048, 1053 (6th Cir. 1983) (citing *Perales*). It is more than a mere scintilla of evidence or evidence that merely creates the suspicion of the existence of a fact, but must be enough evidence to justify a refusal to direct a verdict if the matter were tried to a jury. *Sias v. Sec'y of HHS*, 861 F.2d 475, 479 n. 1 (6th Cir. 1988).

   The substantiality of the evidence is to be determined based upon a review of the record taken as a whole, not simply some evidence, but rather the entirety of the record to include those portions that detract from its weight. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Laskowski v. Apfel*, 100 F. Supp.2d 474, 482 (E.D. Mich. 2000). So long as the decision of the Commissioner is supported by substantial evidence, it must be upheld by the federal court even if the record might support a contrary conclusion. *Smith v. Sec'y of HHS*, 893 F.2d 106, 108 (6th Cir. 1989). The substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).

**b.**   **Child's Disability Evaluation Process.**

Under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub.L. No. 104-193, 110 Stat. 2105,

> An individual under the age of eighteen (18) shall be considered disabled for the purposes of this title if that individual has a medically determinable physical or mental impairment which results in marked or severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(C)(i).

To determine whether a child claimant has impairments that result in marked and/or severe functional limitations, the Commissioner of the Social Security Administration has by regulation created a three-step sequential evaluation process. See, 20 C.F.R. §416.924(a).[1] This process involves a determination of the following questions:

(1) Is the child claimant performing substantial gainful activity? If so, the claimant is not disabled and his or her claim will receive no further review.

(2) If the child claimant is not performing substantial gainful activity, are the child's mental or physical impairments, alone or in combination, considered to be severe? If the child claimant's impairments are not severe, then the child is not disabled and his or her claim will not be further reviewed.

(3) If the child claimant does have severe impairment(s), do the impairment(s) meet, medically equal or functionally equal, any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1? If the child has an impairment that meets, medically or functionally equals all of the criteria of a listed impairment, along with the durational requirement, then the child will be considered to be disabled.

*Id*. *See, Lewis v. Comm'r*, 2010 WL 334472 at *6 (E.D. Mich., Jan. 20, 2010) (discussing the child disability evaluation process); *Justus v. Astrue*, 2009 WL 511148 at *2 (E.D. Ky., Feb. 27,

---

[1] A history of the regulation is discussed in *Molina v. Barnhart*, Case No. 00-CIV-9522(DC), 2002 WL 377529 (S.D.N.Y. March 11, 2002).

2009) (same); *Garrett v. Astrue*, 2009 WL 482105 at *1 (E.D. Ky., Feb. 25, 2009) (same).

Throughout this sequential evaluation process, the child claimant bears the burden to prove his or her entitlement to benefits. *Johnson v. Comm'r*, 2008 WL 5411658 at *2 (E.D. Mich., Dec. 23, 2008) (citing *Boyes v. Sec'y*, 46 F.3d 510, 512 (6th Cir. 1994). To "meet" the criteria of a listed impairment, the child claimant must demonstrate both the "A" and "B" criteria of the impairment. The "A" criteria are medical findings while the "B" criterial describe impairment-related functional limitations. See 20 C.F.R. Part 404, Subpart P, App. 1. An impairment of the claimant that exhibits some, but not all, of the criteria of the listed impairment under review, does not meet the listed impairment no matter how severe the established criteria may be. *Johnson*, 2008 WL 5411658 at *3 (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995); *Selders v. Sullivan*, 914 F.2d614, 619 (5th Cir. 1990)).

If the impairments of the child claimant do not "meet" all the criteria of the listed impairment, they may yet be medically or functionally equal in severity and duration to the criteria of the listed impairment. 20 C.F.R. §416.926a(a). The impairment(s) of the child claimant may "equal" the listed impairment if the claimant demonstrates a "marked" limitation in two domains of the six domains of functioning, or if the child demonstrates an "extreme" limitation in one of the six domains. *Id*; *Johnson*, 2008 WL 5411658 at *3.

A "marked" limitation is defined by 20 C.F.R. §416.926(e)(2)(I) to be one that "interferes seriously with [the claimant's] ... ability to independently initiate, sustain or complete activities.... [It is] ... a limitation that is more than moderate but less than extreme. It is the equivalent of the functioning ... on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id*. An "extreme" limitation is defined by 20

C.F.R. §416.926(e)(3)(I) to be one that "interferes very seriously with your ability to initiate, sustain or complete activities.... [It is] ... a limitation that is more than marked." *Id*. The regulation continues to explain that "extreme limitation" is a "rating we give to the worst limitations.... [but] ... does not necessarily mean a total lack or loss of ability to function. It is the equivalent of functioning that we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.

Functional domain analysis is considered to be the equivalent of analysis of the "A" and "B" criteria for the listed impairment. *Johnson*, 2008 WL 5411658 at *3. It focuses on "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. §416.926a(b)(1). Six functional domains are set forth in the Social Security Regulations. They include:

    (1)    acquiring and using information,

    (2)    amending and completing tasks,

    (3)    interacting and relating to others,

    (4)    moving about and manipulating objects,

    (5)    caring for yourself, and

    (6)    health and physical well-being.

20 C.F.R. §416.926a(b)(1).

As noted, a child claimant must demonstrate marked limitations in two functional domains, or an extreme limitation in one functional domain, in order to establish that he or she functionally equals the criteria of the listed impairment under review. *Lewis*, 2010 WL 334472 at *6 (citing 20 C.F.R. §416.926a(d)). See also, 20 C.F.R. §416.926a(e)(3). Accordingly, for

K.M.W. to prevail on her claim for SSI benefits, she must demonstrate that she is not involved in substantial gainful activity, has a severe impairment or impairments that meet or medically or functionally equal the criteria of one or more of the listed impairments in 20 C.F.R. Part 404, Subpart P. App. 1, part b. In the present case, K.M.W. maintains that she has met the criteria of the listing for mental retardation, listing 112.05D, or in the alternative, has shown that the severity of her impairment(s) functionally equals the criteria of the same listing given her marked limitation in at least two of the six functional domains.

c.     **Mental Retardation Listing 112.05D**

The focus of Wright's first argument falls on finding of fact no. 4 of ALJ Nichols' hearing decision that K.M.W. does not have an impairment or a combination of impairments that equals one or more of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 26). See, 20 C.F.R. 416.924, 416.925 and 416.926. As support for finding no. 4, ALJ Nichols found that none of K.M.W.'s treating or examining physicians concluded that the child has an impairment that satisfies or equals a listing level criteria. (Id.). None of the state agency medical consultants found that K.M.W. has an impairment that meets or equals any listed impairments of Appendix 1. (Id.). Finally, medical expert Dr. Belt, testified at the hearing that K.M.W. has no impairment that meets or medically equals any listed impairment (Tr. 26, 48).

Wright disputes these conclusions as they relate to the listing for mental retardation for children, listing 112.05D. Wright insists that "It is evident that K.[M.]W. is disabled by mental retardation as a matter of law." (DN 11, p. 5). She argues that the consultative examination performed by Dr. Joseph Bargione, Ph.D., in June of 2010, resulted in

7

test scores on the Wechsler Preschool and Primary Scales of Intelligence (3rd Ed.) test that meet the criteria of listing 112.05D.

Listing 112.05D requires that the claimant exhibit a valid verbal, performance, or full-scale IQ of 60 through 70, and a physical or mental impairment imposing an additional or significant limitation of function. 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05D. Upon examination by doctor Bargione, K.M.W. exhibited a verbal IQ score of 77, a performance IQ score of 60, and a full-scale IQ of 64. (Tr. 581). Wright maintains that ALJ Nichols "wholly disregarded" these scores because Dr. Bargione "specifically advised the IQ scores should be viewed with caution due to the claimant's very young age." (Tr. 29, 588).

Wright asserts that her granddaughter's IQ scores, while perhaps preliminary due to her youth, certainly are not invalid, particularly when obtained by a test specifically designed for children of her age group (DN 11, p. 6, n. 1). Given that ALJ Nichols found that K.M.W. is markedly impaired in her ability to acquire and use information (Tr. 30-31), Wright concludes that her valid full-scale IQ score of 64, along with her marked impairment in the functional domain of acquiring and using information work together to fully meet the criteria of the mental retardation listing 112.05D.

> The mental retardation listing 112.05D provides:
>
> 112.05 *Mental Retardation*: Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, D, E, or F are satisfied.
>
> ....
>
> D. A valid verbal, performance or full-scale IQ of 60 through 70

8

>    and a physical or other mental impairment imposing an additional
>    and significant limitation of function.

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.05D.

The regulations explain in the introduction to the listing for mental disorders at 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 112.00:

>    Listing 112.05 (Mental Retardation) contains six sets of criteria. If
>    an impairment satisfied the diagnostic description in the
>    introductory paragraph and any one of the six sets of criteria, we
>    will find that the child's impairment meets the listing. For listings
>    112.05D and 112.05F, we will assess the degree of functional
>    impairment the additional impairment(s) imposes to determine if it
>    causes more than minimal functional limitations, i.e., is a "severe"
>    impairment(s), as defined in §416.924(c). If the additional
>    impairment(s) does not cause limitations that are "severe" as
>    defined in §416.924(c), we will not find that the additional
>    impairment(s) imposes an additional and significant limitation of
>    function.

Id. A severe impairment under §916.924(c) is a medically determinable impairment that is more than a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations. 20 C.F.R. §916.924(c).

For Wright to prevail in her argument on behalf of K.M.W. on this point, she must demonstrate that the child satisfied the diagnostic description in the introductory paragraph for the listed impairment, and the criteria of Subsection D of Listing 112.05. *See, Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001). *See also, Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (claimant must meet all of the specified medical criteria to match a listing impairment). The medical criteria that define the listed impairment have been set "at a higher level of severity than the statutory standard because the listings are designed to operate as a conclusive presumption of disability that eliminates the need for any further inquiry. *Zebley*, 493 U.S. at 532 ("When the

Secretary developed the child-disability listings, he set the medical criteria at the same level of severity as that of the adult listings.")

Here, Wright is correct that the IQ test scores obtained by Joseph L. Bargione, Ph.D. reveal that K.M.W. has both a performance IQ score and a full-scale IQ score that fall within required range of listing 112.05D.  This criteria, however, is not the sole criteria for listing 112.05.  The introductory paragraph to listing 112.05 not only requires that K.M.W. satisfy the diagnostic description for mental retardation, but also that she exhibit a deficit in adaptive functioning.  This criteria is in *addition* to: (1) IQ scores within the requisite range; and (2) the existence of a physical or other mental impairment that imposes additional and significant limitations of function, both of which are required by Subsection D of listing 112.05..

Dr. Bargione administered the Vineland Adaptive Behavior Scale to K.M.W. during his consultative psychological examination on June 26, 2010 (Tr. 581-582).  In his report, the doctor indicates that "[K.M.W.'s] ... adaptive behavior composite score of 74 fell in the moderately low range and was higher than 4% of the children her age."  (Tr. 582).  As the ALJ noted, the Vineland Function Scales revealed only mild delays with scores of 74 in communication, 85 in daily living skills, 72 in social skills, and 79 in motor skills (Tr. 29, 582). K.M.W.'s only marked limitation, as noted by Dr. Bargione, was in her ability to acquire and use information.  (Tr. 29, 585).[2]  Dr. Bargione did not diagnose K.M.W. with mental retardation, but

---

[2] The domain evaluation form completed by Dr. Bargione (Tr. 585-586) reveals no other marked limitation in the remaining domains (attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for yourself, and health and physical well-being).  Unfortunately, Dr. Bargione appears to have erroneously marked the check box on the final page of the form (Tr. 587) to indicate a marked limitation in two of the domains of functioning.  (Id.)  His written comments, both before and afterward, however, confirm that he found only a single marked limitation in the domain of acquiring and using

10

instead assessed an axis I diagnosis of disorder of childhood (Tr. 583).

Likewise, consulting physician Darren M. Farber, D.O., evaluated K.M.W. on Feb. 19, 2010, during a neurology followup visit. (Tr. 386-388). After noting that K.M.W. "continues to thrive and do quite well considering her prior history," Dr. Farber found only that K.M.W. "has [a] very mild cognitive delay." (Tr. 388). Accordingly, while the child's IQ scores, accepted as being accurate, would fall within the requisite range of listing 112.05D, the record does not establish the type of severe deficits in adaptive functioning necessary to meet the diagnostic criteria of the listing. In this regard, ALJ Nichols' decision is supported by substantial evidence.

This conclusion, as the Commissioner notes, is supported by ALJ Nichols' findings in relation to the various functional domains (Tr. 29-35). ALJ Nichols noted that K.M.W.'s adaptive functioning appeared from the record to be higher than her IQ scores might otherwise indicate. For example, K.M.W. was noted to explore her environment, play with toys, show interest in books, and appeared alert and curious (Tr. 29-31, 412, 470). Assessment in October of 2009, by Julie Murray revealed the K.M.W. would search for hidden objects, place pegs on a pegboard, and could attend to a preferred activity for up to three minutes (Tr. 470). K.M.W.'s grandmother reported to Dr. Bargione that her granddaughter enjoyed playing with her two brothers and the other children in the neighborhood, and that she enjoyed playing with her baby dolls and baby stroller (Tr. 580). K.M.W. also was noted during evaluation to be able to walk, run, throw a ball, open a door, climb, manipulate objects with her hands, drink from a

---

information based upon the Wechsler Preschool and Primary Scale of Intelligence Test (Tr. 581, 585). The doctor found no extreme limitations in any of the domains.

cup, remove her clothes without assistance, perform grooming activities and indicate if she was hungry (Tr. 34-35, 470). Such activities, although discussed by the ALJ in that portion of his hearing related to the six functional domains, are supportive of the AJL's determination that K.M.W. did not meet the deficit in adaptive functioning requirement of the initial diagnostic paragraph for listing 112.05.[3]

### d.  Marked Limitation of Functional Domains.

Wright in her alternative argument maintains that even if K.M.W. did not meet or medically equal the criteria of the mental retardation listing 112.05D, she nonetheless functionally equaled the criteria of the listing by exhibiting a marked limitation in two domains of functioning, thereby establishing her functional equivalence. Specifically, Wright points to Dr. Bargione's checkmark on the conclusion page of the domain evaluation form, page 4, which the doctor checkmarked to indicate that Wright has marked limitation in two domains. (Tr. 587).

As the Magistrate Judge previously noted, the checkmark placed by Dr. Bargione, was obviously in error as it is contradicted by his own comments on the other portions of the same form. Dr. Bargione found only marked limitation in one domain, acquiring and using information (Tr. 585). Otherwise, he found less than marked or no limitation in the remaining five domains (Tr. 585, 586). His concluding handwritten comment on the evaluation form

---

[3] Because substantial evidence supports the determination of the ALJ that K.M.W. did not meet the diagnostic description for mental retardation due to the absence of a deficit in adaptive functioning, the Magistrate Judge need not consider whether her marked impairment in the domain of acquiring and using information satisfies the separate requirement of listing 112.05D that K.M.W. possess "another physical or mental impairment imposing an additional and significant limitation of function" in addition to IQ scores within the required range.

indicates only a single marked limitation based upon the Wechsler IQ scores (Tr. 588). Thus, the Magistrate Judge does not agree with Wright that the erroneous checkmark establishes marked limitation in two of the six functional domains.

Wright continues to argue that K.M.W. proved marked limitation in the functional domains of interacting and relating to others, and the domain of health and physical well-being (DN 11, pp. 7-8, 9-11). Specifically, Wright points to her grand daughter's significant language delay as shown by her lack of verbal communication during her June 2010 evaluation by Dr. Bargione (Tr. 583). The doctor noted in his evaluation that during the entire time K.M.W. was in his presence, she used only a single word (Tr. 1). Likewise, during an earlier physical evaluation by doctor Mehmet Akaydin, K.M.W. also spoke only at the very end of the examination process (Tr. 542).

During assessment by Julie Murray at First Steps, Murray observed K.M.W.'s communication skills were significantly delayed, stating that "[K.M.W.] does not put words together to form simply phrases and is not always consistent with imitation." (Tr. 470). Wright adds that K.M.W. is noted by her caregivers at daycare to keep to herself and that her grandmother related to Dr. Bargione that K.M.W. "is very scared of a lot of things ..." (Tr. 471). Wright concludes that given K.M.W.'s well-documented communication difficulties, "her interaction and relationship with others is necessarily markedly impaired." (DN 11, pp. 8-9).

A child claimant will be found to have a "marked limitation" in one of the six functional domains if his or her impairments interfere seriously with the ability to independently initiate, sustain or complete activities. 20 C.F.R. §416.926a(e)(2). A marked limitation, as noted above, is one that is more than moderate, but less than extreme. Id. ALJ Nichols determined

13

that K.M.W. has less than marked limitation in the domain of interacting and relating to others. Substantial evidence supports this finding.

As the Commissioner notes, the treatment records repeatedly reflect that K.M.W. is described by adults who have evaluated her as being social, engaging and sweet-natured (Tr. 470). ALJ Nichols himself determined that K.M.W. was able to interact adequately, albeit with definite shyness. (Tr. 33). Julie Murray noted in her assessment of Oct. 2, 2009, that K.M.W. does observe her peers and plays near other children, "responds positively to familiar adults and shows a desire to communicate." (Tr. 470). Murray further noted that K.M.W. expressed a variety of emotions, enjoyed being with her grandmother, followed directions and responded positively to verbal praise. (Id.). She noted that K.M.W. exhibited independent behaviors and greeted others on request. Murray found that "overall [K.M.W.] is an easygoing and sweet child." (Tr. 470).

K.M.W.'s grandmother also reported to Dr. Bargione that K.M.W. enjoyed playing with her brothers and other children in the neighborhood. (Tr. 580). Dr. Farber in his assessment of Feb. 2010, reported that although K.M.W. does have a mild delay, she was making progress and used 10-15 word vocabulary. (Tr. 386). The doctor found her to be socially appropriate for her age, albeit somewhat shy (Tr. 387). Accordingly, the above evidence of record is sufficient to support ALJ's Nichols determination that K.M.W. had a less than marked limitation in this domain.

Wright maintains that apart from interacting with others, K.M.W.'s extensive medical records show a marked limitation in the domain of health and physical well-being given the child's thoroughly documented herpes encephalitis, which initially caused multi-organ

14

system failure (Tr. 273). While K.M.W.'s encephalitis has largely resolved, Wright points out that the child remains at significant risk for developmental disabilities given the complications that she suffered, which included septic shock, hepatophy, coagulopathy, cholestasis, and seizures (Tr. 380).

Wright notes that medical evaluator Joanne Sexton, M.D., in her evaluation of Feb. 20, 2008 found K.M.W. to have a marked limitation in the area of health and physical well-being (Tr. 267). At that time, Dr. Sexton wrote that K.M.W. had suffered a "potentially devastating illness" and was having seizures every other day (Id.). Likewise, four months later in June, medical evaluator James Underwood, M.D., also found that K.M.W. had marked impairment in her health and physical well-being (Tr. 338), although he did note that "most problems have resolved...." (Id.). K.M.W also currently remains under treatment for asthma and uses a budesonide mini-nebulizer twice daily, along with an albuterol mini-nebulizer she uses four times a day (Tr. 208). In view of these circumstances, Wright maintains that any finding other than a marked limitation in the domain of health and physical well-being would require one to "ignore the plethora of medical documentation contained in K.M.W.'s record." (DN 11, p. 10).

The Magistrate Judge has carefully reviewed the extensive medical evidence of record. It is true that K.M.W. unfortunately suffered from significant neonatal complications due to her herpes encephalitis, a potentially deadly condition. Likewise, early-on following her birth, two non-examining state agency consultants did find K.M.W. to have marked limitation in the functional domain of health and physical well-being. (Tr. 267, 338). ALJ Nichols, however, correctly observed that these complications, i.e., daily seizures, had significantly resolved by the

time of the administrative hearing some 30 months after the child's birth.

This conclusion is confirmed by the treatment records of Dr. Jonathan Sayat who concluded that K.M.W.'s encephalitis-related complications have resolved or were in remission. (Tr. 380). Dr. Farber likewise found that K.M.W. was doing "remarkably well" and had only "very mild cognitive delay." (Tr. 388). Along the same lines, consultative examiner Mehmet Akaydin M.D., found K.M.W. to be fully intact, quite functional and without any overt limiting deficits. (Tr. 541-45). Further, Wright reported to Dr. Akaydin that K.M.W. had not had any seizures for quite some time (Tr. 533). Indeed, at the time of the administrative hearing in March of 2010, K.M.W.'s representative advised the ALJ that the claimant had experienced no seizures in the prior 8 months (Tr. 45). Accordingly, ALJ Nichols properly considered the child's encephalitis-related complications to be essentially resolved by the time of the administrative hearing more than two and a half years after the child's birth in September of 2007.

ALJ Nichols properly determined K.M.W.'s asthma condition to be well controlled by her daily nebulizer treatments, as well (Tr. 28, 45, 208). Dr. Farber observed in his evaluation from February of 2010, that K.M.W., who was then taking asthma medication, had no coughing, wheezing or shortness of breath (Tr. 387). Dr. Akaydin found K.M.W.'s lungs to be clear without any overt wheezing and good breath sounds (Tr. 534-35). In light of this evidence, ALJ Nichols cannot be faulted for finding that K.M.W. has a severe impairment of asthma which is under adequate control (Tr. 26). Because K.M.W. does not have an extreme limitation in any of the six functional domains, or marked limitations in two domains, she has failed to prove that her severe limitations meet or equal any of the listed impairments, including listing 112.05D.

For this reason, the Magistrate Judge shall recommend that the decision of the Commissioner be affirmed.

## RECOMMENDATION

For the reasons set forth above, the Magistrate Judge recommends that the decision of the Commissioner be **AFFIRMED**.

## NOTICE

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived. *Thomas v. Arn*, 728 F.2d 813 (6th Cir. 1984), *aff'd.,* 474 U.S. 140 (1985). 28 U.S.C. § 636(b)(1)(c); Fed.R.Civ.P. 72(b).

Copies to Counsel of Record